19-1047 Sandoval v. UNUM Life Insurance 19-1047 Sandoval v. UNUM Life Insurance 19-1047 Sandoval v. UNUM Life Insurance 19-1047 Sandoval v. UNUM Life Insurance 19-1047 Sandoval v. UNUM Life Insurance 19-1047 Sandoval v. UNUM Life Insurance 19-1047 We must prove that they acted unreasonably under the circumstances and knowingly or recklessly disregarded the validity of the claim. There is evidence in the record, undisputed evidence in the record, that they acted unreasonably by not having a specialist look at the records that were submitted on appeal, instead having a general practice doctor with no orthopedic experience review the records or form an opinion. So what's your evidence on that? Your Honor, the statements of fact from the original motions, Your Honor, which are contained in the appendix, the facts that prove that, Your Honor, are They have a policy of giving deference to the treating provider. Appellee has admitted that their policy also has a doctor qualified in the same area analyze and review. In addition, there was the facts concerning the job description and what elements make her job up were in dispute, Your Honor. In the original motion, the appellee failed to mention that her job description included driving as well as lifting 25 pounds. On the appeal, we provided to them a statement from her orthopedic surgeon, a functional capacity evaluation, a report from a vocational expert who had interviewed and conducted an investigation of Ms. Sandoval and her capabilities, as well as a statement from our client of her pain. Once you got that information, they had a meeting and they decided to send this to a general practice person to review everything. They did not send it to the original orthopedist who had reviewed it previously. So this was a third doctor reviewing the file, right? Correct, Your Honor. It was a third doctor who reviewed it who had no surgical experience, had been a hospitalist for part of his career, said in his deposition, which is a fact admitted, that he... It would have been, I guess, a neutral reviewer. He wouldn't be biased by the... If they'd sent it back to the same previous doctors, wouldn't that become a more biased situation than bringing in a third-party independent doctor? Your Honor, this person was an employee of UNUM. The point is they did not follow their own policy in that they did not get the specialist, an orthopedist, who specializes in spinal neck surgeries. Instead, they send it to somebody who's done some hospital rounds and done some stitching and been a hospitalist to review. As well as the functional capacity evaluation, he has no expertise in that area. But he knows what an FCE is. And so Dr. McAllister did give a reason that you dispute that he didn't... reflect the heart rate for each one of these activities. You point out that, I think, for the isoinertial lift and carrying, it did. But there were a lot of tasks that were assessed on the FCE in which there is no reflection of heart rates. So why does it matter what Dr. McAllister's specialty was? Because you haven't come forward with a reason that I can fathom to dispute that particular rationale that Dr. McAllister had offered for disputing your interpretation of the FCE. Your Honor, the FCE... We would have the position that Dr. McAllister was not qualified to review the FCE. He has no qualifications about how to conduct those tests or anything of that nature. Is there anything... Okay, let's say now. I mean, have you presented any reason with the benefit of consultation with a specialist that would give us a reason to disbelieve his analysis that on the piece of paper, it's obvious that there was no heart rate for before and after for a lot of the tasks that were reported on that FCE? Yes, Your Honor. In our reply, or in our motion, we specify that that was misread and misinterpreted, as well as trial testimony from Dan Ward, who conducted the FCE. There was one particular question where he was cross-examined regarding, I believe it was the PEG board test, but don't quote me on the exact test, but Ms. Sandoval plast and flying colors in the 90 percentile. He was cross-examined by that, about that, and he said, well, the standard or the baseline for that was done around the turn of the century from women who did shuttlecocks on when you make fabrics. And so that was one test. He said, everybody passes that test. He also explained where the heart rates were done within it. He also explained the other factors he uses to see Ms. Sandoval or anybody he conducts these on are exerting true effort. Is this trial testimony you're talking about? Yes, Your Honor. Okay. So let's assume that you thoroughly impeached him at trial and made him look terrible, like he didn't know what he was doing. How does that equate to bad faith at the summary judgment stage? What do you have at summary judgment that shows that the insurance company wasn't able to rely on him? Their own policies, Your Honor. Their policy that they will give deference to the treating physician. Okay. So let's talk about that. I mean, you agree that they don't have to always defer to the treating physician, right? I mean, it's something they consider, they give great weight to the treating physician, but if their own internal personnel disagree with the treating physician, they don't have to completely just give way to what the treating physician says, do they? Your Honor, I believe, according to their policy, is to give them deference. What does deference mean? Does that mean they give the treating provider more credit than two of their doctors? Does that mean they hold off on their opinion because the treating physician gave that? That was something that was not presented to the jury to decide. That is a material fact. What does deference mean in the case of this? Does it mean, oh, we'll give him the same credit we give three of our doctors that aren't orthopedists, or we'll give him all the credit to where we'll overturn all of our doctors to go with their opinion? Well, they tried. I mean, you know, Dr. Scott tried to contact, or Towns, if I'm not mistaken, contacted Dr. Barker, and he said, well, I don't have time, you know, to talk to you. And then when, after Dr. Scott had analyzed the records, that she, as I understand it, she wasn't able to get any communication from Dr. Barker. And then they hired, because she rejected the claim, and out of respect to Dr. Barker's status as the treating physician, they then hired a second doctor, Dr. Dunn, and they were never able, prior to the administrative appeal, to get Dr. Barker to respond to anything. And even at that point, all they did was send his records, I think, in the administrative appeal, and then send, but he still would never talk to, you know. Correct, Your Honor. He's a business professional. He has no obligation. Well, but so they tried, in other words, to get clarification. How is that unreasonable? Your Honor, I would also state that Dr. Barker did reply to their letter. He provided medical records in reply to their letter. He did not have time to sit down and give an interview to a doctor. He thought he was giving medical records to another trained professional who would be able to read them and take into account the significant extra information you get when you actually meet a person and put hands on and can feel the muscles, the tremors, the things that cause Ms. Sandoval pain. So I don't believe them simply trying to call. And if he had replied with nothing, then they might have something, but he sent his medical records. He had replied to a previous letter a month, I believe it was 30 to 45 days beforehand. He had replied to that letter. They sent another letter. He sent the medical records and said no changes. He had placed her. He had not released her back to work until June. They cut off her benefits in May. I would argue that's not deference to the training physician. He asked for another six months to reevaluate her, come in June, and they cut off her benefits in May. So does the deference have to go to the treating physician's final decision to release someone to work, or is it deferring to other things that the treating physician might opine about, sort of the building blocks to the ultimate releasing someone to work? Your Honor, I believe that according to their own policy, it should be deference in all of his opinions. Okay. So in your position, it would be if the treating physician says she can't go back to work, then basically no matter what any of the company docs say, they have to live with that. I'm sorry, Your Honor. Did you say could or could not go back to work? Okay, she could not go back to work, and even if the company docs disagree, they just have to live with it. Your Honor, I believe then they would have to do more investigation. Maybe that's when they enforce the other policies of requiring Ms. Sandoval to cooperate, to do a nurse practitioner interview, to do an IME, to potentially get an outside source to do an independent review, paper review, because all the experts or all the doctors and employees of Unum, none of them met with Ms. Sandoval. None of them touched her. None of them saw her react to testing of whether she was feeling pain. Dr. Barker, he did. That's what he wrote in his reports. Their failure to give the treating physician, who is touching and actually visually looking at the patient, deference for that, I think, goes clearly against their policy, which shows it was unreasonable. Were you planning on addressing the company docs? Yes, I was watching my time. Go ahead and stop the clock. I think what I want to do is let's let your colleague come up and go ahead and turn it off the clock. And then I'll give you a little bit more time, and you can come up and address the second issue. Okay. So let's turn to Unum, Mr. Rossman. You can address it in whatever order you want, whatever your game plan is, but I want to hear from him on the cosmetology when you're done. Sure, Your Honor. Ken Rossman on behalf of Unum Life Insurance Company of America. And with respect to affirmance of the Summary Judgment Award, we certainly urge affirmance of the Summary Judgment Award. A district court is not required to go beyond the reference portions of the evidence in deciding summary judgment. And this court does not review district courts' decisions on summary judgment based on materials that weren't adequately brought before the district court. Move the mic up just a little higher there. Weren't adequately brought before the district court. And so what we have here is an unusual case. Before the district court, Unum presented 123 material facts that showed an extensive review by three doctors. In response, under Judge Martinez's rules, Ms. Sandoval admitted, rather than contesting each of those facts, with a couple of exceptions, but by and large admitted 123 facts. And then she offered in place for her positions 15 facts. And those are the facts on which the district court was allowed or entitled to decide. Courts are not restricted to facts. A district court can go looking in the record if it chooses, but it's not reversible error not to go looking. This is the Petit's case that was decided last year, the Adler versus Wal-Mart case that has been cited quite a bit in this court. Were the 15 facts that the plaintiff cited complementary or contradictory to your 123 facts? They were, I think it would be fair to say both. Some of them are certainly sort of run in parallel and don't directly contradict in any fashion, but they are additional. And some of them aren't facts. And so I would like to focus this court on the facts that were offered that were supported by the expert report. Because on appeal, certainly on the opening brief, the expert report is the basis of the appeal. And in front of the district court, and this can be found at the appendix page 374, three facts were offered by Ms. Sandoval, supported by the expert, to support these arguments that we're hearing. The first is the failure to follow industry standards is sufficient to show bad faith. That's not a fact. And the expert doesn't add anything, so the district court properly did not, you know, treat that as part of the analysis that he had to consider as establishing a standard. The second fact was it is not reasonable to adopt a non-examining physician's opinion simply because it supports denying a claim. Again, it's not a fact. And it's unsupported both by the expert and by any other facts cited by Ms. Sandoval before the district court. There's no evidence in the record that Unum merely adopted its physician's opinions because they supported denying a claim. And so... When you have a dispute like this, though, why wouldn't Unum have sent a doctor to personally examine Ms. Sandoval? Well, certainly... That just seems... There is a right to have an independent medical examination. Ms. Sandoval was, in fact, informed of the right that she could ask for an independent medical examination. She didn't. And the key on summary judgment is that there's no evidence of a standard requiring Unum to actually do that. So certainly Unum could have asked for an independent medical examination. But the question here for reasonableness is, is there any sort of industry standard or statute or policy requiring them to do so? And there was no evidence of any of those things. Can I probe that a little bit? Is the fact that her condition, her ailment, was pain, does that undermine the reasonableness of not referring her to an IME? In other words, you have three independent doctors, Dr. Scott, Dr. Dunn, and Dr. McAllister, that are looking at documents. They're not looking at her. And yet she is saying, I am physically in pain. Okay, true, I have five out of five range of movement. But I am in considerable pain. The doctor that was treating her, that was examining her, Dr. Barker, verified that she was. And so is it not at least viewing the evidence of the like most favorable to the plaintiff, isn't it a reasonable inference that when the condition complained of is pain, that you need to have, that it's unreasonable not to refer her to someone who will at least be an examining physician, not necessarily a treating physician, but someone who actually examines her? Again, Your Honor, I think it would be something that UNUM could have done, and it's something that Ms. Sandoval specifically had the right to request as part of the review, to request an independent medical examination. Whether she did or didn't, I mean, you all had to get it off the statutory agenda. The key question for the judge on summary judgment was, is there any evidence that there is a standard such as the one that you just identified, that UNUM is supposed to, when it's pain, do something different? And there was no evidence to that regard. I think on page 30 of the order, the judge makes it very clear what he felt he was facing in this case. He says, Sandoval's total failure to cite any evidence supporting her position in the argument section of the brief is the undoing of her bad faith claim. Here the district court was presented with a total absence of admissible evidence on standards that support the criticisms that she was making about this review. And what she needed to do in order to survive summary judgment, to be able to get over the hurdle for unreasonable, is establish the yardstick for what is some evidence showing the yardstick for what is reasonable and what is unreasonable, and then some evidence to support that UNUM failed to hit that yardstick. Now the third fact that was cited below for the expert is to properly evaluate the claim UNUM should have requested additional testing, conducted additional interviews, contacted the provider to clarify results, or read all reports. And that's a statement found in the expert report. That's what I just read is the proposed fact from the brief in response to the motion for summary judgment. And again, the expert in this case did not offer any sort of fact showing what the basis was for his assertion. And so, or frankly, fact supporting it like for reading all reports. There's a complete absence of evidence supporting the notion that they didn't read the reports here. So in your opinion, what should he have done? Should he have listed out, you know, reviewed hundreds of these claims in my lifetime, and I'm aware of the items that insurance companies ought to consider, and one of the items they should consider is whether there's independent evidence of the pain, and they should also routine. In the other 200 cases I've reviewed, they've conducted an IME. I mean, are those the kind of facts that he needed to support his report with? The law, the Zolman case among others, the law establishes that the basis for expert opinion is either policy, actual failure to follow their own policy, or the statute. This is section 1104, which sets out, essentially it says it has to be reasonable, so it's a bit circular. With respect to some other criticisms that don't occur in this case, that statute may be more relevant. And then it would be an expert report, just like an expert in any other industry, who says, I have, you know, done reviews like this, and this is the process, and when I have faced a question like this, I consistently take another action. Explaining, for example, in the FCE. So there's criticism of the FCE and the fact that Dr. McAllister only stated that he was frustrated by the failure to show heart rate for individual tasks. Well, if an expert typically, if you want to provide visible evidence challenging that as being unreasonable, you would say that in the industry, people, when they face this question, take these actions, based on my experience of doing this type of thing. There's nothing like that found in this expert report, and certainly nothing like that found in the facts urged on the district court in the response to summary judgment. On reply, I believe for the first time we hear that this case is truly about actions taken only after appeal. There's no support for that in the law, that you only look at one narrow sliver, and I certainly have found nothing suggesting that, and I would urge on this court that the appropriate review for reasonableness is the whole host of facts, and certainly that's what the district court looked at. One thing I would like to mention is that we raised an alternative argument. So there's a common law claim and a statutory claim. The common law claim has two elements. Both claims have the reasonable aspect. The common law claim also requires knowing or reckless disregard, and we below argued with the trial court that there was insufficient evidence on that point. The court didn't get to it. It's an alternative basis for you to affirm with respect to the common law claim. We argue in our brief there was no response, and so at the very least we would urge that the common law claim must be affirmed, the dismissal of the common law claim. On the cross appeal, we raised two issues. One is the occupation question, and the second is the regular care of the physician question. I do want to clarify one thing. In our request for relief in our brief, we asked for reversal for dismissal. That's incorrect if you decide our way on the question of regular care of the physician. We concede that she was under regular care of the physician until October of 2016, and so there, if you agree with us, it should be a remand for a recalculation of damages, not a remand for dismissal. If you agree with us on the occupation question, it would be a remand for dismissal. Focusing on that. Is the October 2016 date the last day she was seen by the physician? Correct. Okay, and so your position would be that the physician telling her, okay, I'm going to see you today, October 16th, I'm keeping you on as a patient, come back if you need anything, that at that point she's no longer under the care of a physician? Correct. What if he had given her appointments, come back and see me in six months? I think that would be sufficient. Okay. I think that's evidence of continued treatment. I think we all go to the doctor, and when things, you can always go back to your doctor if something comes up. And so what the requirement for regular treatment is trying to capture is there is some sort of ongoing treatment for this type of problem. For chronic pain, it could be a host of things. There's nothing in the record established by them showing what a regular course of treatment for regular pain would be at trial. But one could conceive of prescriptions, come back to make sure the prescriptions are working or not working. It's something prospective. It's not backwards looking, but it's prospective that there is a condition that requires some sort of forward-looking care by a physician other than whenever the patient decides they may or may not want to go back. What if he had said, I don't know if you're going to need to come back or not? It's going to depend on how well you progress. So I'm not going to schedule an appointment for you now, but if you need to come back, call me and make an appointment. So the definition in the policy of the regular treatment is care like that given for this condition. And so were the evidence to support that for a person in this condition, the regular care of a physician is something like what you just offered, Your Honor, then I suppose one could reasonably find that. But here there is an absence of evidence permitting the jury to find that there was a regular course of care going forward that would permit something like that. The evidence was the doctor said, after a series of different questions, she's not under my regular care. The doctor also said he wasn't sure what regular care meant. But there was no evidence of a forward-looking plan that had any structure or any aspect of a requirement to see the doctor or get some sort of treatment. The policy says regular care means you visit a physician as frequently as is medically required. That's the definition of regular care. And I was trying to summarize that. Why isn't that met in either Judge Carson's hypothetical or what occurred here? Because Barker said he had not discharged her as a patient. I think what we argue is that the ordinary language of, as required, it suggests at least getting some care. And here we have the absence of care going forward. And so there is a difference between the test is getting the care like that that one normally gets for a condition that you have. And here the offered testimony wasn't that she was on a plan similar to other folks in her condition. It was that she had stopped seeing the physician and had no appointment to come back unless she decided she wanted to go back. I mean, Barker was a specialist, right? Yes. And so he's not someone that you would just go to continually. So wouldn't you think that if Barker thought she was finished, then he would have discharged her as opposed to just keeping her set up to where she could come back and see him if necessary? I see. I'm out of time. May I? Go ahead and answer. There's no evidence at the trial suggesting something like that? I mean, there's evidence that he's a specialist, isn't there? There is evidence that he's a specialist. Based on sort of common experience, I'm not sure that doctors typically formally discharge you instead of saying you can come back if you ever need to. So in the absence of any evidence, I think it was improper for a juror to conclude that, in fact, the absence of treatment was actually treatment. Thank you, counsel. Don't go. Counsel, come on back. Sorry, we have another question. I just have one question about your cross-appeal, and that is with regard to the second definition of disability. The district court clearly relied on that as one of two independent reasons for concluding that there's at least a tribal issue of fact on whether or not the plaintiff is disabled. In your opening brief, you did not challenge that. Now, true, the appellee on the cross-appeal didn't address that. You did address that in your reply brief. We typically will say that an appellant, and in this case you are the appellant, weighs a challenge to an independent rationale by failing to include it in your opening brief. Bones v. Honeywell, Zartner v. Miller, A.M. v. Holmes, we have said that a number of times. You didn't address that until your reply brief. Why didn't you waive your challenge to the second rationale of the district court by omission in your opening brief? It's our position that the district court misconstrued. It wasn't raised at trial either. We misconstrued that alternative provision, which is the partial disability provision, for the initial provision, which was the position that applied the total disability, the first definition. And so we did not address it for that reason. And I think the fact that it was not responded to on that point and was not raised at trial supports the notion that it was inappropriately decided upon, but I certainly take your point. Okay, thank you, Counsel. Thank you, Counsel. Could you put 230 for rebuttal? Thank you, Your Honor. Just real quickly, I would like to address some things about the unreasonable aspect and the common law bad faith. There are no experts required under Colorado law for bad faith or unreasonableness. Expert opinions can be based solely on experience. The expert also quoted Colorado law as well as Colorado case law, mostly focusing on what a reasonable investigation in that it's unfair claim settlement, refusing to pay claims without conducting a reasonable investigation. The dispute here is what is a reasonable investigation? There are facts in the motion and in our reply that establish, one, the description of the job is in dispute. Two, they did not follow their own procedures, which were having a specialist in the same area analyze the records. Three, they did not give deference to the treating doc. To the second part, regarding the regular care, the policy states regular care is defined as you personally visit a physician as frequently as is medically required according to generally accepted medical standards to effectively manage and treat your disabling conditions. And you're receiving the most appropriate treatment and care, which conforms with generally accepted medical standards. But in this case, there really was no anticipated future medical care. I mean, isn't she in the same position as any other patient that goes in for some type of treatment? They do everything they can. There's no expectation of a future appointment. Under your theory, people are under the regular care of a doctor in perpetuity, aren't they? No, Your Honor. Unless there's something in the record that says you hereby discharge, which we don't have. Well, Your Honor, Dr. Barker was asked directly under cross-examination, is she no longer under your regular care? He said, scheduled care, yes, sir. And he says, I don't know what regular care means. Regular care is a term of art. He had her under scheduled care, which he considered appropriate. There's no testimony or evidence in the record showing an opposite medical opinion. The defendants called the doctor. They actually asked the doctor, you saw that Dr. Barker said that he follows patients two weeks out of surgery, six weeks out, three months, six months, nine months, and one year out. Do you remember seeing this in his testimony? It was death physician testimony. Nowhere do they ask, which this is an OCMED doctor, so not an orthopedist. Nowhere do they ask if that's a standard of care for an orthopedist. Additionally, on the second aspect, they had the claims adjuster, who also they asked, it also says you must be under regular care of a physician to qualify. They did not define that definition either. In addition, Your Honor. You're over time. Why don't you go ahead and wrap up. Okay, yes, Your Honor. I just wanted to point out one thing. In their initial denial letter, this is at AA249, Una never mentions they had been paying her benefits at this point, and the only basis they give for denying her is that she can perform the regular duties of her occupation, not that she's under the regular care of a physician or any of the other reasons they allege. Thank you. Thank you, Counsel. Counsel, excused. The case is submitted.